UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**OLGA LAVANDEIRA,**

    **Plaintiff,**

vs.                                               CASE NO.:

**ANDREW H. WARREN,** *in his official capacity as* **STATE ATTORNEY FOR THE THIRTEENTH JUDICIAL CIRCUIT,**

    **Defendant.**
_____/

**COMPLAINT**
**DEMAND FOR JURY TRIAL**

COMES NOW, Plaintiff, OLGA LAVANDEIRA, by and through her attorney, brings this lawsuit seeking injunctive and declaratory relief against ANDREW H. WARREN, *in his official capacity* as STATE ATTORNEY FOR THE THIRTEENTH JUDICIAL CIRCUIT, ("SAO") for violations of Title II of the Americans with Disabilities Act ("ADA"). Defendant failed to provide effective communication, auxiliary aids and services, meaningful access, and denied Plaintiff full and equal enjoyment of Defendant's services, facilities, and privileges. Defendant also failed to make reasonable modifications in policies, practices, procedures, and failed to train personnel to work effectively with deaf citizens.

## INTRODUCTION

From October 2017 to November 2017, four (4) people were alleged to have been murdered by Howell Donaldson ("Donaldson"), a/k/a The Seminole Heights Serial Killer.[1] Ms. Lavandeira is the mother of the second murder victim, Monica Hoffa ("Monica"). Monica was murdered on October 11, 2017, she was only thirty-two (32) years old, and was the only daughter of Ms. Lavandeira. Ms. Lavandeira is deaf, and uses American Sign Language ("ASL") to communicate effectively. Throughout her daughter's murder investigation, meetings with the prosecutor's office, meetings with the victim advocate, and court hearings, the Defendant failed to provide sign language interpreters and meaningful access to Ms. Lavandeira. Ms. Lavandeira and her family members made repeated requests for interpreters, but the Defendant was defiant in their ongoing exclusion. Upon the murder of her only child, Ms. Lavandeira was plunged into a legal system obligated to include her, but, instead, was shut out as she desperately tried to find out how her child was found murdered in a vacant lot.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the actions pursuant to 28 U.S.C. §§ 1331, 1343, for the Plaintiff's claims arising under the ADA.

2. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) - (b)(2) because, (1) the Defendant is located in this district, and or (2) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred and are occurring within this district.

---

[1] As of the filing date of this Complaint, Donaldson has not yet been convicted of the four (4) murders.

## PARTIES

### PLAINTIFF

3. Plaintiff, Olga Lavandeira ("Ms. Lavandeira"), is and was, at all times relevant, a resident of Hillsborough County, Florida. Ms. Lavandeira is deaf, she cannot speak clearly, and uses American Sign Language ("ASL") to communicate. She is a qualified individual pursuant to the ADA.

### DEFENDANT

4. ANDREW H. WARREN, *in his official capacity as* STATE ATTORNEY FOR THE THIRTEENTH JUDICIAL CIRCUIT ("SAO"), is a public entity within the meaning of Title II of the ADA, 42 U.S.C. § 12131(1), and its implementing regulations.

## FACTUAL ALLEGATIONS

5. Ms. Lavandeira is the mother of Monica Hoffa, who was murdered on October 11, 2017, and her body was found on October 13, 2017, in a vacant, overgrown lot in Tampa, Florida.

6. Ms. Lavandeira is deaf, and uses American Sign Language ("ASL") to communicate effectively. She was born deaf in Cuba, and raised in a household where the primary language spoken was Spanish. Ms. Lavandeira cannot speak clearly, and cannot lip-read. She reads at an approximate second grade level.

7. The Office of the State Attorney for The Thirteenth Judicial Circuit consists of several programs, one such program is the Victim Assistance Program

("VAP"). The VAP is mandated to assist victims, help them navigate through judicial proceedings, and arrange for translators if needed.

8. Approximately one week after Monica's murder, the only information Ms. Lavandeira had about her daughter's death was by way of what her family members told her, or what she learned by watching the news on TV (when the information broadcasted on TV was captioned). At that time, it was her understanding that Monica had been shot five (5) times, with several shots to the face.

9. Monica's funeral was held on October 21, 2017.

10. JoCarrol Bird ("Ms. Bird"), a victim's advocate, contacted Ms. Yurian Gutierrez, Plaintiff's niece, to set an appointment to complete an application for VAP services. On approximately November 17, 2017, a meeting was scheduled for Ms. Lavandeira, her parents, and Ms. Gutierrez to meet with Ms. Bird. The family was told the purpose of the meeting was to discuss the legal process, comfort the grieving family, and explain the services SAO/VAP shall provide to Plaintiff.

11. Ms. Gutierrez told Ms. Bird, on the phone, an ASL interpreter was needed, because Ms. Gutierrez's signing skills were very limited. There was no sign language interpreter provided. As a result of the SAO's failure to secure an ASL interpreter, Mrs. Gutierrez was forced to attempt to interpret in both Spanish for Monica's grandparents, and in ASL for Ms. Lavandeira. This was completely ineffective, extremely upsetting, and brazenly cruel to Ms. Lavandeira who was left out of the meeting.

12. At this first meeting, Ms. Lavandeira made an explicit and affirmative request for sign language interpreters for all meetings with VAP/SAO, and for court

4

hearings. Ms. Bird documents the request for interpreters for hearings/trial in her case management notes.

13. Ms. Lavandeira and her family were told the VAP would arrange for interpreters for the court hearings, and for meetings with the SAO/VAP. At no time was Ms. Lavandeira or her family told they should ask anyone else for interpreters for the court hearings.

14. Donaldson was arrested by the Tampa Police Department ("TPD") on November 28, 2017, as the suspect in the four (4) murders.

15. On November 28, 2017, the TPD held a press conference about the arrest of Donaldson. TPD used a "fake" sign language interpreter at the press conference, who held no interpreting credentials, and was not vetted by the Public Information Officer of the TPD. This debacle garnered national news. Ms. Lavendeira could not access the recorded press conference, and continued to be deprived of accessible information about the case.

16. Andrew H. Warren, the state attorney, Attorney Pruner, and Attorney Terry, assistant state attorneys working on the Donaldson case, were aware of the TPD's use of a fake ASL interpreter.

17. After Donaldson's arrest on November 28, 2017, Ms. Bird called Ms. Gutierrez to let the family know Donaldson's First Appearance had been scheduled at the Thirteenth Judicial Circuit on November 30, 2017. Ms. Gutierrez requested an ASL interpreter for the Plaintiff, because they had been told to place their interpreting

requests through VAP.[2] The request was denied, and Ms. Lavandeira was told it was just going to be a "short" hearing.

18.     To view Donaldson's First Appearance on November 30, 2017, the murder victims' families were taken to a special viewing room to watch the hearing by remote TV.

19.     There was no ASL interpreter, and Ms. Lavandeira and Ms. Gutierrez renewed the request for an ASL interpreter to Ms. Bird. They were told the court could not provide an ASL interpreter due to budgeting problems.

20.     Ms. Lavandeira's niece was unable to interpret for Ms. Lavandeira in ASL, and for Ms. Lavandeira's parents in Spanish. Ms. Lavandeira continued to request an interpreter from the victim's advocate, and an attorney present, but no interpreter was provided. Ms. Lavandeira was unable to have meaningful access to the hearing, or the conversations being held in the room.

21.     After the court appearance that day, Ms. Lavandeira and her family met with a detective from the TPD in the hopes of getting more information about what they knew now about Monica's murder. Although an interpreter was requested for that meeting, none was provided. Ms. Gutierrez was forced to attempt to interpret in ASL for Plaintiff and Spanish for Monica's grandparents. Plaintiff continued to be deprived of information about her daughter's murder.

---

[2] As of the date of filing of this Complaint, Ms. Lavandeira continues to be told that request for interpreters for the court hearings are to go through the VAP, and VAP shall contact the court on Ms. Lavandeira's behalf. Ms. Lavandeira has specifically asked if she is required to request interpreters directly from the Thirteenth Judicial Circuit, and has been directed not to do so.

22. After Donaldson's First Appearance, and every court hearing to follow, attorneys from the State Attorney's office, along with Ms. Bird would meet with the victims' families, either in the hallway of the courthouse or in their office (off site), to talk further about Donaldson's case.

23. At times, there were up to three (3) attorneys from the State Attorney's office present. An ASL interpreter was not provided for these private meetings with the families. When Ms. Gutierrez was present, she would attempt to interpret, but it was not effective. When Ms. Gutierrez could not take the time off from work to interpret, there would be no interpreter.

24. In December 2017, State Attorney Andrew Warren asked his staff to schedule a plenary meeting to talk with the four (4) victims' families. The meeting occurred on December 6, 2017, in the grand jury room. The meeting was to "discuss with the victims' families the process that was going forward and specifically the issue of capital punishment."

25. Prior to the meeting, Ms. Lavandeira requested an ASL interpreter from Ms. Bird, but the request was again denied. As soon as Ms. Lavandeira arrived at the meeting, she again asked Ms. Bird why interpreters were not provided, and was told interpreters were not being provided.

26. In attendance were at least three (3) attorneys from the SAO which included Andrew H. Warren. Also, in attendance was Ms. Bird, another victim advocate, and possibly some investigators from the SAO. There were approximate 15-20 family members present, and some people were participating by telephone.

27. The staff of the SAO stood or sat in the front of the room, and could see the families. Ms. Lavandeira was in plain sight, and her need for an interpreter was obvious.

28. An open and heartfelt discussion ensued about the State Attorney's plan to possibly seek the death penalty for Donaldson. The room was full of upset family members peppering questions about the case and the evidence, etc. The meeting continued for approximately two (2) hours.

29. Due to the fact that the SAO failed to provide an interpreter, Ms. Lavandeira's niece was again, forced to try to interpret in ASL for Ms. Lavandeira and in Spanish for Ms. Lavandeira's parents. It was not effective. Ms. Lavandeira was unable to understand or participate in this meeting.

30. Ms. Lavandeira felt forgotten and extreme despair as she struggled to understand what was being said in the meeting. She was upset that her niece was being forced to interpret for her in ASL, and her parents in Spanish. She was desperate to learn what the other family members were asking, what happened to Monica, and the SAO's plans to punish Donaldson. She was appalled at the cruelty she endured.

31. After the meeting, Ms. Lavandeira broke down and cried inconsolably. It was now approximately two (2) months after her daughter's murder and the opportunity to interact with the SAO, as the mother of a murder victim, had been lost, and she continued to be shut out.

32. Sometime soon after the plenary meeting, State Attorney Warren requested individual meetings be set with each victim's family. The meeting for Ms. Lavandeira was to be held on January 8, 2018.

33. Ms. Bird contacted Ms. Gutierrez to set the meeting at Monica's grandparents' home in Tampa. Again, although the family had already made an explicit request for interpreters for meetings with the SAO, they requested an interpreter from Ms. Bird for the meeting, but the request was denied.

34. At the in-home meeting on January 8, 2018, two (2) attorneys from the SAO came to Monica's grandparents' home in Tampa, to include State Attorney Andrew H. Warren. Also, in attendance were Ms. Lavandeira, her parents (who spoke only Spanish), Yurian Gutierrez and her husband, and Monica's estranged father who participated by telephone.

35. Due to the failure of the SAO to secure an interpreter, Ms. Gutierrez was again forced to interpret in Spanish for Ms. Lavandeira's parents, and in ASL for Ms. Lavandeira. Ms. Gutierrez told the attorneys present the Plaintiff needed an interpreter because she cannot sign fast enough and was "losing interpretation." Communication was completely ineffective, and denied the Plaintiff any meaningful access to the meeting.

36. Compounding the denial of ASL interpreters was the denial of the fundamental, personal service of directly engaging with Ms. Lavandeira. The SAO repeatedly failed to contact Ms. Lavandeira directly, and used her family as intermediaries to share case information and other important matters.

37. Ms. Bird's case notes reflect she was in constant contact with various state attorneys, and management about Ms. Lavandeira's requests for interpreters, but they too failed to intercede on Ms. Lavandeira's behalf. The staff of the VAP/SAO has not been trained of their obligations under the ADA, and report using family members as interpreters.

### Court Hearings and Meetings with Attorneys before or after hearings

38. Hoping to gain some information on the case, Ms. Lavandeira attended several court hearings which were held at the Thirteenth Judicial Circuit. Unfortunately, her requests for ASL interpreters for the hearings were also denied.

39. At each of the Court hearings, the state attorney, and the assistant state attorneys would normally acknowledge Ms. Lavandeira's presence in some way in the courtroom. e.g. a wave, nod or short remark.

40. Depending upon the attorneys' schedules, they would also speak directly and privately to the families after the hearings. Although the attorneys who spoke to the families would alternate, the meetings after the hearings were always held by at least one assistant state attorney, if not the State Attorney Andrew Warren himself.

41. On November 17, 2017, Ms. Lavandeira and her family were told to request ASL interpreters through VAP. On information and belief, this was done because the dates of the hearings can change, and because the SAO wants to track the next of kin who attend and plan accordingly.

42. Ms. Lavandeira was also told by Ms. Bird if a court hearing was going to be "short," ASL interpreters would <u>not</u> be provided. Email messages between Ms. Bird and her superiors confirm the same.

43. As instructed, a request was made to Ms. Bird for interpreters for the First Appearance on November 30, 2017. No interpreter was provided. Attorneys from the State Attorney's office and Ms. Bird were present, and failed to intervene on Ms. Lavandeira behalf to secure an interpreter.

44. On January 26, 2018, Ms. Lavandeira and her deaf wife attended a court hearing for Donaldson at the Thirteenth Judicial Circuit. Ms. Gutierrez was also present. Prior to the hearing, Ms. Lavandeira requested an interpreter from the VAP, but was told the court could not afford an interpreter.

45. At this hearing attorneys from the state attorney's office were present, and failed to intervene on Ms. Lavandeira's behalf to secure an interpreter. Attorneys from the State Attorney's office, along with Ms. Bird met with Ms. Lavandeira, and the other victims' families after the hearing without an ASL interpreter.

46. After this hearing, and having seen Ms. Lavandeira denied interpreters with the VAP/SAO meetings, and now for court hearings, Ms. Shelina Reneau, Ms. Lavandeira's wife, intervened on Ms. Lavandeira's behalf.

47. Sometime in January 2018, Ms. Reneau looked online and found the ADA office for the Thirteenth Judicial Circuit and called to request ASL interpreters. Ms. Lavandeira and Ms. Reneau had received interpreters in the past for other court matters

(not related to the Donaldson case), and believed the court had interpreters to interpret the Donaldson hearings.

48. Ms. Reneau spoke to a person who said they worked in the ADA Office for the Thirteenth Judicial Circuit. Ms. Reneau was asked to provide the case number, which she did not have. She obtained the case number, then called the ADA Office of the Thirteenth Judicial Circuit back and provided the case number.

49. Ms. Reneau explained she was deaf, and Ms. Lavandeira was the deaf mother of one of the victims of Seminole Heights Serial Murderer, and she wanted to attend the court hearings. Ms. Reneau was told requests for ASL interpreters for the Donaldson case must come from the state attorney's office, not from them.

50. Relying upon that information, and not wanting to get in trouble, Ms. Lavandeira continued to make requests for ASL interpreters for the court hearings through the VAP.

51. On information and belief, on March 8, 2018, Ms. Lavandeira and her deaf wife attended Donaldson's court hearing. As instructed by the court, prior to the hearing, she requested ASL interpreters from Ms. Bird, but the request was denied. Attorneys from the State Attorney's office and Ms. Bird were present, and failed to intervene on Ms. Lavandeira's behalf to secure an interpreter. Attorneys from the State Attorney's office met with Ms. Lavandeira and other victim's families after the hearing without an ASL interpreter.

52. On April 4, 2018, Ms. Lavandeira wanted to attend another Donaldson hearing. However, Ms. Bird said the hearing would be "short," therefore an interpreter

would not be provided. As instructed by the ADA office at the Thirteenth Judicial Circuit, Ms. Lavandeira did not contact the court directly, and continued to follow their directive to seek services through the VAP. Due to the fact there would be no interpreter, it would be impossible for Ms. Lavandeira to understand the court hearing, so Ms. Lavandeira did not attend. Ms. Lavandeira was also denied the opportunity to talk with the assistant state attorneys after the hearing, because they met with the families after each hearing.

53. On April 25, 2018, another Donaldson hearing was held, and Ms. Lavandeira wanted to attend, and requested an interpreter. However, the VAP said the hearing would be "short," and she did not need to attend. Due to the fact the hearing, according to the VAP/SAO, was short meant an interpreter would not be provided. These were the code words used by the VAP to limit the hearings Ms. Lavandeira could attend to avoid the cost of the interpreter.

54. Ms. Lavandeira did not attend, because she would not be afforded an interpreter. Ms. Lavandeira was also denied the opportunity to talk with the attorneys after the hearing, because they met with the families after each hearing.

55. On July 26, 2018, Ms. Lavandeira and her deaf wife attended Donaldson's court hearing related to his competency to stand trial. Prior to the hearing, as instructed by the ADA office at the court, they requested ASL interpreters from the VAP. This time, the VAP/SAO secured and paid for the ASL interpreters for the hearing.

56. The Administrative Office of the Court at the Thirteenth Judicial Circuit, do not have a process in place to inform the Judge, or court personnel there shall be an

ASL interpreter present in the courtroom. Apparently if an interpreter arrives, they proceed to interpret in the courtroom. Unless the ASL interpreter is secured by the Court Administrator's office, there is no safety net for Ms. Lavandeira, or the Judge, to confirm who sent the interpreter, and or their qualifications.

57.  Due to the lack of oversight, ASL interpreters were being sent and withheld for the Donaldson hearings. When the interpreter secured by the VAP appeared in court, she stood in the front of the courtroom, in plain sight. Yet, it appears no one asked any questions as to why there was an ASL interpreter present for this Donaldson hearing, but not the others.

58.  Finally having received an interpreter for the July hearing, Ms. Lavandeira believes she will continue to receive interpreters for the court hearings, but she is wrong.

59.  For the January 29, 2019, court hearing she requested an ASL interpreter from the VAP, but the request was denied. Ms. Lavandeira was told the hearing was too "short," and they would not provide an interpreter. She refused to attend.

60.  However, this hearing, like others the VAP said were going to be short, was not short. In fact, Donaldson personally addressed the court during this hearing to request to be present for the hearings, his desire to read the transcripts of the hearings, and need for medical care.

61.  Ms. Lavandeira was denied the opportunity to be present, because the SAO/VAP was controlling the hearings she could attend by deciding when they would provide an ASL interpreter, and labeling hearings too short. Due to the fact the

Thirteenth Judicial Circuit ADA office told her to request interpreters from the SAO/VAP, Ms. Lavandeira could not obtain relief.

62. Prior to the February 27, 2019, court hearing, Ms. Lavandeira requested an ASL interpreter, and was told by VAP an interpreter would be provided. An ASL interpreter was secured and paid for by the VAP. On this date, there were at least three (3) deaf people in attendance at the hearing to include Ms. Lavandeira.

63. The ASL interpreter arrived very late for the hearing, and informed Ms. Bird she would be late. Instead of advising the Judge that an ASL interpreter was on her way for Ms. Lavandeira, Ms. Bird said nothing. The interpreter arrived after the hearing was completed.

64. In approximately February of 2019, fourteen (14) months after Monica's murder, Ms. Lavandeira was told to watch a news story entitled "51 Days of Terror." Ms. Lavandeira tried to access the story on Facebook, but it is a podcast consisting of audio only, and there were no captions.

65. Ms. Lavandeira asked a friend, who knows sign language, to interpret the story to her in ASL. Now, approximately fourteen (14) months after her daughter's murder, after the public knows, and, in spite of the Defendant's defiance to accommodate her, Plaintiff learned more about what happened to her daughter, and the circumstances around her murder. She is outraged and helpless as she continues to be shut out of the system.

66. Donaldson has been granted a motion for four (4) separate trials, one for each victim. The four (4) trial dates have not yet been set. There are currently other

legal issues on appeal in Donaldson's criminal cases.[3] Ms. Lavandeira's receipt of services from the SAO shall not soon end. Plaintiff is eligible for the SAO/VAP services up to a post appeal on Donaldson's case.

67. Ms. Lavandeira shall confer with the State Attorney, and the assistant State Attorneys about the case, she shall provide a victim impact statement, and shall attend future meetings called by the VAP/SAO.

68. Ms. Lavandeira shall continue to attend court hearings, and the trial for her daughter in the Donaldson matter. Ms. Lavandeira shall also attend portions of the other three (3) victim's trials. Ms. Lavandeira has been specifically told to continue to request interpreters for the court hearings through the VAP, and has been doing so.

69. Although she is receiving interpreting services now for the zoom court hearings, she is still being required to go through the VAP office to request services. The zoom hearings shall eventually revert back to onsite hearings, and Plaintiff shall require interpreting services for the hearings and all meetings with the SAO. As the case progresses and trial draws near, meetings with the SAO (which have now stopped) shall occur at an alternate location not the court house. Ms. Lavandeira shall face future discrimination by the SAO/VAP.

70. There are at least six (6) ASL Interpreter Referral Agencies serving the Tampa area, which can provide both onsite interpreters and interpreters through VRI for the Defendant.

---

[3] *State of Florida v. Howell Donaldson*, Case No. 2D21-1195. (Fla. 2nd DCA, Appeal filed April 23, 2021).

71. Defendant's callous and brazen ongoing denial of Ms. Lavandeira's federally protected rights were intentional, and continued even after numerous requests were made to accommodate Ms. Lavandeira.

72. As a result of Defendant's actions described above, Ms. Lavandeira suffered irreparable loss and injury including, but not limited to, humiliation, embarrassment, emotional distress, and a deprivation of her rights to non-discrimination on the basis of her disabilities. She seeks declaratory and injunctive relief to enjoin Defendant from this ongoing discrimination.

## COUNT I

### VIOLATIONS OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT

73. Plaintiff repeats and re-alleges allegations ¶¶ 1-72 in support of her claims.

74. In Count I, Plaintiff seeks declaratory relief and permanent injunctive relief pursuant to Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, and its implementing regulations.

75. Plaintiff is deaf, and her disabilities substantially limit major life activities as defined by Title II of the ADA. Plaintiff meets the essential eligibility requirements for Defendant's services at all times material hereto and is entitled to the protections of the ADA under 42 U.S.C. § 12132, *et seq.*, and its implementing regulations.

76. Defendant is a public entity pursuant to 42 U.S.C. § 12131 (1), and subject to the mandates of Title II of the ADA and its implementing regulations.

77. No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132.

78. Defendant must provide effective auxiliary aids to ensure deaf people can access their services. The term auxiliary aids and services include qualified interpreters, or other effective methods of making aurally delivered materials available to individuals with hearing impairments. 42 U.S.C. § 12103 (1) (A).

79. Defendant failed to give "primary consideration" to the requests of individuals with disabilities in determining what auxiliary aids and services are necessary. 28 C.F.R. § 35.160(b)(2). (Emphasis added).

80. In order to be effective, auxiliary aids and services must be provided in accessible formats, <u>in a timely manner</u>, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. § 35.160 (b) (2). (Emphasis added).

81. A public entity shall not require an individual with a disability to bring another individual to interpret for him or her.  28 C.F.R. § 35.160 (c).

82. Defendant's actions were intentional and violated the rights of the Plaintiff by their refusal to reasonably accommodate Plaintiff, even after Defendant was put on full notice of their obligations to abate such discriminatory actions.

83. Plaintiff has been injured and aggrieved by, and will continue to be injured and aggrieved by Defendant's discrimination.

84. As the mother of a murder victim, Plaintiff shall continue to use Defendant's services, and faces future discrimination as further described above.

**WHEREFORE**, Plaintiff requests the following relief:

A. The Court assume jurisdiction;

B. The Court enter a declaratory judgment that the actions of Defendant, as described in this Complaint, be in violation of the ADA;

C. Enter a permanent injunction for the Plaintiff enjoining Defendant, their successors, agents and employees, and all other persons in concert therewith, from taking or continuing any action which has the purpose or effect of discriminating against the Plaintiff on the basis of failing to effectively communicate and failing to provide meaningful access to services in violation of the ADA;

D. Award reasonable attorney's fees, expenses, and costs of suit; and

E. Grant such other relief as the Court may deem equitable and just under the circumstances.

## JURY DEMAND

Plaintiff demands trial by jury on all issues which can be heard by a jury.

Date: November 16, 2021.

> Respectfully submitted,
> Morgan & Morgan
>
> */s/ Sharon Caserta*
> Sharon Caserta, Esq.

Florida Bar No.: 0023117
Morgan & Morgan
Deaf /Disability Rights
76 South Laura Street, Suite 1100
Jacksonville, FL 32202
(904) 361-0078 (Voice)
(904) 245-1121 (Videophone)
(904) 361-4305 (Facsimile)
scaserta@forthepeople.com
*Counsel for Plaintiff*